Filed 9/13/21  In re S.S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re S.S. et al., Persons Coming Under the Juvenile Court Law. | C092905 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.S. et al.,<br><br>Defendants and Appellants;<br><br>S.S. et al.,<br><br>Appellants. | (Super. Ct. Nos. 18DP00007 & 18DP00008) |

Mother C.S., father Jo.S., and minors S.S. and J.S. appeal from the juvenile court's orders terminating parental rights and freeing the minors for adoption.  (Welf. & Inst.

1

Code, §§ 366.26, 395.)[1]  They argue the juvenile court erred by not finding the sibling exception to adoption applies in this case.  They also contend that the Butte County Department of Employment and Social Services (Department) did not adequately inquire into the minors' possible Indian ancestry, as required by the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).  We conditionally reverse the orders terminating parental rights and remand for further ICWA compliance.

BACKGROUND

*Facts and Procedure*

On January 12, 2018, the Department filed section 300 petitions on behalf of minors S.S. (then age three) and J.S. (then age 11 months), after a violent altercation resulted in parents' arrest.  The minors' older half siblings, then ages 11 and 9, with whom the minors resided, were also detained.  The juvenile court assumed jurisdiction, adjudged the minors dependents of the court, ordered the minors removed from parental custody, and ordered reunification services be provided to parents.  After a few months of separation, the minors and their half siblings were placed together in a foster home, where they have remained throughout these dependency proceedings.

Mother's reunification services were terminated in November 2018 and father's reunification services were terminated on February 21, 2019.  All parties agreed that the minors and half siblings were bonded and should stay together if possible.  The juvenile court declined to order a sibling bonding study.  The section 366.26 hearing was set for October 6, 2020.

By the time of the section 366.26 hearing, the caregiver foster parents had been caring for the minors and their half siblings for two and a half years, during which time the caregivers had never expressed that they did not want any of the children in their

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

2

home.  The minors were doing well in their placement, had developed a strong relationship and substantial emotional ties with their caregivers and considered the caregivers their mom and dad.  They sought attention, reassurance, and direction from the caregivers and it was assessed that removal from the caregivers home would be detrimental to their wellbeing.

It was acknowledged by everyone that it would also be detrimental to the minors to be separated from the half siblings, who they looked up to and respected, and with whom they had shared experiences.  The minors looked to the older half siblings for guidance, comfort, and affection; they appeared by all accounts to share a loving sibling bond.  The minors' older half siblings did not want to be separated from the minors but they also made it clear that, while they are happy the minors are being adopted and will grow up with parents, they do not, themselves, wish to be adopted.  The Department had no intention of changing the placement of any of the children and, instead, intended to finalize the minors' adoption and the half siblings' legal guardianship with the current caregivers at the same time.

The juvenile court took judicial notice of its May 7, 2020, orders, made in the half siblings' case, that their placement with the current caregivers was appropriate.  The court found the minors adoptable and considered whether the sibling exception to adoption applied.  It concluded that it was speculative that the older half siblings would not remain in the home with the minors where they had been placed for two and a half years.  It also noted that J.S. considered the caretakers to be his parents and the minors had been in the home for a long time.  Focusing its concern on how detrimental not keeping the sibling set together would be to the minors, the court found the exception to adoption did not apply and terminated parental rights.

*ICWA Compliance*

Father filled out the parental notification of Indian status form (Judicial Council Forms, form ICWA-020 (Jan. 1, 2008); hereafter ICWA-020 form) on March 1, 2018,

3

indicating he may have Cherokee ancestry and the Department sent notice of the proceedings to the identified tribes. Mother filled out the ICWA-020 form on February 21, 2019, indicating she is, or may be, a member of, or eligible for membership in, the Pomo band of Indians. The maternal grandmother thereafter provided information for the Indian ancestry questionnaire indicating the minors have Indian ancestry through the Pomo and "Wailiki," including pertinent relative information for those who are members of Pomo and "Wailiki," as well as enrollment numbers for many of those relatives. Notice was sent to the Pomo, Wailaki, and Cherokee tribes, as shall be further discussed herein.

On October 10, 2019, upon motion by the Department, the juvenile court found the Department had complied with the ICWA requirements, there was no reason to know the minors are Indian children, and no further ICWA noticing was required.

Additional facts are contained in our discussion of the issues.

DISCUSSION

I

Sibling Exception to Adoption

Appellants contend the juvenile court erred in failing to apply the exception to adoption based on avoiding interference with a sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) We will affirm the juvenile court orders.

The selection and implementation hearing held pursuant to section 366.26, "is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53.) " '*The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child. [Citation.]" (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

4

There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is when termination of parental rights would result in "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

There is a "heavy burden" on the party opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) The authors of the legislation envisioned that the applicability of this exception would " 'likely be rare.' [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 950.) This language from the legislative history has been interpreted to mean "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption," (*ibid.*) "*particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount.*" (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014, italics added.)

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 952, fn. omitted.) If the court determines that the child has a significant sibling relationship and would suffer detriment if that relationship were severed, the court then must weigh the benefit to the child of continuing the relationship against "the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re L.Y.L.,* at pp. 952-953.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.* (2021) 11 Cal.5th 614, 639-641; *In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*In re Caden C.*, at p. 641.)

Here, it was not a forgone conclusion here that termination of parental rights would substantially interfere with the sibling relationship. (See *In re D.O.* (2016) 247 Cal.App.4th 166, 175; *In re S.B.* (2008) 164 Cal.App.4th 289, 300.) As noted by the juvenile court, the evidence was lacking that a permanent plan of adoption for the minors was likely to result in either the termination of their relationship with their older half siblings, or even a separate placement. The minors' caretakers had been caring for the four-sibling set for two and a half years. They had agreed to assume guardianship for all four children and, when informed that the subject minors could be found independently adoptable and, should that occur, be placed in a different home for adoption, agreed to adopt the minors while assuming guardianship of the older siblings, in order to keep all four children in the home. They had also voiced their willingness to adopt all four children in order to keep the sibling group intact. Thus, it appeared the minors and their half siblings would be raised together in the caretakers' home.

Appellants argue the juvenile court erred in not finding the sibling exception to adoption applies because the different permanency plans for the minors and their older half siblings results in the *possibility* that the minors could, at some point, be separated from their older siblings. We note, however, that neither would guardianship *guarantee* the minors would remain placed with the older half siblings. Guardianship, by nature, is not necessarily permanent and while the Department may attempt to place the four

6

children in guardianships in the same home should a placement change be necessary, there is no guarantee it could find another suitable placement. Only adoption provides permanence. This is the reason the Legislature has declared it the preferred plan. But, because the older half siblings at ages 12 and 14 objected to being adopted,[2] no permanent plan for the minors could *guarantee* the minors would never be separated from their older siblings.

And while it true that placing the minors in guardianships could assure continued *contact* between siblings, the evidence presented and the parties' arguments focused on the potential detriment should the minors not remain in the same home. There was no evidence that, in the event the older half siblings were moved to another home or once they moved out after reaching the age of majority, the caretakers would likely refuse to permit the minors to have continued contact with their older half siblings. And there was no evidence presented that maintaining a sibling visitation schedule or contact alone, while living in separate homes, would benefit the minors to such an extent as to outweigh the benefits they would gain from adoption.

It was undisputed that the minors have a significant bond with their older half siblings. But while the minors' relationships with their half siblings is important, so too is permanency for these young minors. The minors' oldest half sibling was 14 years of age at the time of the section 366.26 hearing and would be potentially leaving his placement in only four years. On the other hand, J.S. and S.S. were removed from parental custody at one and three years of age, respectively, and had already been in the dependency system (and placed with their current caregivers) for over two and a half years by the time of the section 366.26 hearing. At ages three and five, they would be in

---

[2] Objection by a minor 12 years or older to termination of parental rights can form the basis for determining that termination of parental rights would be detrimental to the child under the child-objection exception to adoption. (§ 366.26, subd. (c)(1)(B)(ii).)

7

their permanent plan for 15 and 13 years, respectively. The plan presented was to have them adopted by the only parents these minors have ever really known and to be raised in the same home as their older half siblings.

The juvenile court could reasonably find leaving these young minors in a tenuous placement for nearly their *entire* childhood, depriving them of the stability of permanent parents and having them raised in the dependency system, for the sole purpose of avoiding the possibility of separation or loss of contact should the older half siblings be removed from that home prior to reaching the age of majority, was not in their best interests. It could reasonably conclude that the benefits of stability and permanency the minors would gain from adoption outweighed the detriment they might suffer should their relationship with the half siblings end.[3]

## II

## ICWA

Appellants contend the Department and juvenile court failed to comply with the inquiry and notice requirements of the ICWA because the Department used incorrect addresses and agent names on the ICWA notices it sent to Cloverdale Rancheria of Pomo Indians, Pinoleville Pomo Nation, and Sherwood Valley Rancheria.[4] We agree and remand for further ICWA compliance.

---

[3] We disagree with father's assertion that the juvenile court was not aware it could find the sibling exception applies to an otherwise adoptable child. We are satisfied that the record establishes the contrary. We also reject father's untimely contention that the court erred in denying the Department's request for a bonding study. That order was entered on June 20, 2019, and was not appealed. (§ 395.) The instant appeal is not timely as to that order. (Cal. Rules of Court, rule 8.406.)

[4] Appellants also contend that notice was equally erroneous to the Dry Creek Rancheria and Coyote Valley Band of Pomo Indians, in that notice to each of these tribes were also misaddressed. Dry Creek Rancheria, however, responded shortly after the notice was sent that the minors do not qualify for membership or enrollment. We also grant respondent's May 4, 2021, request we take judicial notice of the response received

8

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. (See 25 U.S.C. § 1902; *In re Levi U.* (2000) 78 Cal.App.4th 191, 195-196.) A major purpose of the ICWA is to protect "Indian children who are members of or are eligible for membership in an Indian tribe." (25 U.S.C. § 1901(3).) The ICWA defines " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); *In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The juvenile court and the Department have an affirmative and continuing duty to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).)

At the time these proceedings were instituted, the ICWA required that notice of the proceedings be given to any federally recognized Indian tribe of which the child might be a member or eligible for membership whenever the juvenile court knew or had reason to know that a child involved in a dependency proceeding was an Indian child. (25 U.S.C. §§ 1903(8), 1912(a); *In re Robert A.* (2007) 147 Cal.App.4th 982, 988-989.) A mere suggestion of Indian ancestry was sufficient to trigger the notice requirement. (*In re Robert A.*, at p. 989.)

By the time of the October 10, 2019, hearing at which the juvenile court found the ICWA did not apply in this case, California had passed Assembly Bill No. 3176 (2017-2018 Reg. Sess.), which amended the statutes implementing the ICWA, including portions related to inquiry and notice. As amended, section 224.2, subdivision (e)

---

from the Coyote Valley Band of Pomo Indians during the pendency of this appeal indicating that the minors are not members or eligible for enrollment with that tribe. Accordingly, the Department's error was harmless as to these two tribes. (See *In re J.T.* (2007) 154 Cal.App.4th 986, 994.)

provided: "If the court, social worker, or probation officer has reason to *believe* that an Indian child is involved in a proceeding, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable. Further inquiry includes, but is not limited to, all of the following: [¶] (1) Interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.3[;][5] [¶] (2) Contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility[;] [¶] (3) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility. *Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the federal Indian Child Welfare Act of 1978 (25 U.S.C. Sec. 1901 et seq.).* Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, former subd. (e), italics added; Stats. 2018, ch. 833, § 5.) Formal notice (such as the notice the Department sent in this case) is required only when the further inquiry results in a reason to *know* the child is an Indian child. (See § 224.2, subd. (d) [defining circumstances that establish a "reason to know" a child is an Indian child]; § 224.3 [ICWA notice is required if there is a "reason to know" a child is

---

**5**        Section 224.3, subdivision (a)(5) includes the name, birth date, and birthplace of the Indian child, if known; the name of the Indian tribe; and the names and other identifying information of the Indian child's biological parents, grandparents, and great-grandparents, if known.

an Indian child as defined under § 224.2, subd. (d)]; *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

Here, after the maternal grandmother confirmed that the family has several members who were registered with the Pomo tribe, the Department sent formal notice on April 2, 2019, to 28 tribes, the Bureau of Indian Affairs (BIA), and the Secretary of the Interior in accordance with the ICWA noticing provisions.  (25 C.F.R. § 23.11 (2018); § 224.2, former subd. (e); § 224.3, subds. (a) & (c); Cal. Rules of Court, former rule 5.481(a)(4); *In re D.W.* (2011) 193 Cal.App.4th 413, 417; *In re Mary G.* (2007) 151 Cal.App.4th 184, 209.)  There is no evidence of any other efforts made by the Department to contact and share information with any of the Pomo tribes to allow the tribes to make a membership or eligibility determination, as required by section 224.2, former subdivision (e)(3).  The Department's notice (and, therefore, efforts to contact and share information), however, was inadequate as to three of the tribes because the Department did not send that notice to the agents or addresses designated by the tribes, as required by section 224.2, former subdivision (e)(3).

The applicable list published by the BIA of designated tribal agents and addresses for the Department's April 2, 2019, mailing was published on June 4, 2018.  (83 Fed.Reg. 25685 (June 4, 2018).)  A comparison of the designated agents and addresses listed and those the Department used reveals the Department sent the ICWA notice to the incorrect addresses for Cloverdale Rancheria of Pomo Indians and Pinoleville Pomo Nation.  (83 Fed.Reg. 25707 & 25709 (June 4, 2018).)  The Department mailed the ICWA notice to the correct address for Sherwood Valley Rancheria but addressed the notice to "Tribal ICWA Director; individual not identified on Federal Register," instead of "Michael

11

Fitzgerral, Tribal Chairman" as designated in the then-applicable Federal Register.[6]  (83 Fed.Reg. 25709 (June 4, 2018).)

These errors in notice may be deemed harmless when the record contains a return receipt signed by the correct designated agent, or when a response is actually received from the tribe.  (See *In re J.T.*, *supra*, 154 Cal.App.4th at p. 994.)  Here none of the return receipts for these three improperly noticed tribes were signed by the agent designated by the tribe and none of these tribes responded to the notice.  (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1201 [ICWA notice insufficient, despite signed domestic receipts, where notice not sent to designated agent and no response to notice was received]; *In re J.T.,* at p. 994 [same].)  On this record, we cannot conclude the error was harmless.

"Notice is a key component of the congressional goal to protect and preserve Indian tribes and Indian families.  Notice ensures the tribe will be afforded the opportunity to assert its rights under the [ICWA] irrespective of the position of the parents, Indian custodian or state agencies.  Specifically, the tribe has the right to obtain jurisdiction over the proceedings by transfer to the tribal court or may intervene in the state court proceedings.  Without notice, these important rights granted by the [ICWA] would become meaningless."  (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421.)  "[O]ne of the primary purposes of giving notice to the tribe is to enable the tribe to determine whether the child involved in the proceedings is an Indian child.  [Citation.]"  (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 470.)

Remand is required to assure inquiry and proper notice for Cloverdale Rancheria of Pomo Indians, Pinoleville Pomo Nation, and Sherwood Valley Rancheria.  We note

---

[6]     Pursuant to California Rules of Court, rule 5.481(c)(4), the ICWA notice must be sent "to the tribal chairperson unless the tribe has designated another agent for service." (See also *In re H.A.* (2002) 103 Cal.App.4th 1206, 1213.)

that the Federal Register has since been updated and the most current designated agent and address contained in the Federal Register must be used on remand.

## DISPOSITION

The orders terminating parental rights are conditionally reversed and the matter is remanded for compliance with the inquiry and notice provisions of the ICWA. If, after further inquiry and notice to Cloverdale Rancheria of Pomo Indians, Pinoleville Pomo Nation, and Sherwood Valley Rancheria, the minors are found not to be Indian children, the orders terminating parental rights shall be reinstated. If, however, the minors are found to be Indian children as defined by the ICWA and the court determines the ICWA applies to this case, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with the ICWA, including considering any petition filed to invalidate prior orders. (25 U.S.C. § 1914; § 224, subd. (e).)


　　　　　　　　　　　　　　　 /s/
　　　　　　　　　　　　　　　 HOCH, J.



We concur:


 /s/
MAURO, Acting P. J.



 /s/
RENNER, J.



13